IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

**VINCENT BOYD, Ph.D.,**

    Plaintiff,

vs.                                              Civil Action No. _____

**ST. JUDE CHILDREN'S RESEARCH HOSPITAL, Inc.**

    Defendant.

## COMPLAINT

Plaintiff Vincent Boyd, Ph.D. (hereinafter "Plaintiff," "Dr.Boyd," or "Boyd") brings this action against Defendant St. Jude Children's Research Hospital, Inc. (hereinafter "Defendant" or "St. Jude") for violation of his rights under the Family and Medical Leave Act ("FMLA") of 1993, §§ 2601, *et seq.*, and the Americans with Disabilities Act Amendments Act ("ADAAA") of 2008, 42 U.S.C. §§ 12101, *et seq.*

## PARTIES

1. Plaintiff Vincent Boyd is an adult citizen of the United States. At all times relevant to this dispute, he resided in Germantown, Tennessee and was employed by Defendant St. Jude in Memphis, Tennessee. He has recently moved to Tyler, Texas.

2. He was awarded a Ph.D. in Chemistry by Texas A & M University in 1995. His graduate, post-graduate, and subsequent professional career had been focused on drug discovery and development.

1

3. Defendant St. Jude Children's Research Hospital is a nonprofit medical corporation headquartered in Memphis, Tennessee. Founded in 1962, it is a world renowned pediatric treatment and research facility focused on children's catastrophic diseases. Defendant's corporate offices are located at 262 Danny Thomas Place, Memphis, TN 38105.

4. Pursuant to 29 U.S.C. § 2611(4)(A)(i), Defendant is an "employer" as the term is defined under the FMLA because Defendant is engaged in commerce or an activity affecting commerce and has employed more than fifty employees for each working day during each of twenty or more work weeks in the preceding calendar year.

5. Pursuant to 29 U.S.C. §2611(2)(A), Plaintiff was an "eligible employee" as the term is defined under the FMLA because he had been employed continuously by Defendant since May, 2007, until the termination of his employment in August, 2016.

6. Pursuant to 42 U.S.C. 12111(5)(A) and 29 C.F.R. § 1630.2 (e)(1), Defendant is an employer for purposes of the ADAAA.

**7.** At all times relevant to this dispute, Plaintiff Vincent Boyd had a disability as defined by 42 U.S.C. § 12102(1).

## JURISDICTION AND VENUE

8. Jurisdiction to adjudicate Plaintiff's claim under the FMLA is conferred on this Court by 29 U.S.C. § 2617(a)(2) and 28 U.S.C. §§1331 and 1332.

9. Jurisdiction to adjudicate Plaintiff's claims under the ADAAA is conferred on this Court by 28 U.S.C. §§1331, 1332 and 1391.

10. Venue is proper in this District because Plaintiff was employed by Defendant in this District at all times relevant to this dispute and the cause of action arose in this District within the meaning of 28 U.S.C. § 1391.

## PROCEDURAL REQUIREMENTS

11. On February 29, 2016, Dr. Boyd filed a charge of disability discrimination against Defendant with the Equal Opportunity Commission ("EEOC"). The charge – attached hereto as Exhibit 1 – was filed within three hundred (300) days after the alleged unlawful employment practice first occurred and continued to occur for months thereafter.

12. Per Plaintiff's request, the EEOC issued a Notice of Right to Sue on November 17, 2016. (*See* Exhibit 2).

13. This lawsuit is timely filed within 90 days of Plaintiff's receipt of the Notice of Right to Sue.

## FACTS

14. Dr. Boyd began his employment at St. Jude Children's Research Hospital in May, 2007, as a Principal Laboratory Medicinal Chemist and leader of the High Throughput Chemistry Center ("HTC") in St. Jude's Department of Chemical Biology and Therapeutics.

15. He reported directly to the Principal Investigator Dr. Thomas Webb until early 2013. Thereafter, he reported directly to the Department Chair Dr. R. Kip Guy.

16. Plaintiff's position entailed designing potent tools and medicines for the potential life – saving treatment of St Jude's patients, coordinating collaborations and spearheading new directives towards high priority targets dictated by St. Jude's needs.

17. To this end, Plaintiff devoted his time and efforts to devising and designing desirable research projects for St. Jude. Much of this time was dedicated to exploring and fostering opportunities for collaboration with other research centers and academic departments toward St. Jude's high priority targets and managing the work on many of these projects – both

within and outside HTC-- while concurrently supervising and trouble-shooting the work of his direct reports.  Boyd's role was to confer with experts in alternative but complimentary drug design fields for the purpose of advancing projects that could potentially lead to new treatments.

18. Plaintiff's intermediate success and the projects he participated in were measured by the number of high quality publications and/or the number of patents obtained as a result of the projects.

19. Dr. Boyd also devoted substantial time to assisting in the writing and submission of grant applications to federal agencies and private foundations as well as to the preparation of abstracts and articles published in peer-reviewed journals specializing in drug design.

20. St. Jude hired Plaintiff to spearhead and advance research projects in medicinal chemistry for the benefit of St. Jude and its patients.  This was his job duty, to which he devoted nearly 100% of his time

21. He devoted less than 5% of his time to laboratory bench work, and this time allotment was comparable to the time devoted to laboratory bench work by Dr. Jaeki Min, the other Principal Medicinal Laboratory Chemist in the Department of Chemical Biology and Therapeutics.

22. At all times relevant to this dispute, Dr. Boyd supervised the work of three (3) research assistants who reported directly to him.   Of the three, two held a Ph.D. in chemistry and one a master's degree.  Each of his assistants had ample education, training and experience in chemistry to create chemical reactions (i.e., to perform laboratory bench work) and did so routinely in performance of their duties at St. Jude under Dr. Boyd's direction.

23. As Dr. Boyd's annual performance evaluations reflect, he was a valued employee who who consistently exceeded St. Jude's high expectations.

24. Dr. Boyd gave his heart and soul to his work. He took great pride in belonging to the St. Jude community and furthering its mission as he shared the same values as St. Jude's founder, Danny Thomas.

25. As such, he was an avid participant in St. Jude events and activities – whether blood/platelet drives, entertainments, parties or games – undertaken for the benefit of the children and to lift their spirit.

26. While playing kickball in a St. Jude Intramural League game in late August, 2014, Dr. Boyd suffered an unsuspected injury that led to a series of strokes.

27. The injury consisted of a dissection of one of the vertebral (basilar) arteries in Dr. Boyd's neck that supplies oxygen-rich blood to his brain. The resulting strokes occurred in the right occipital lobe and the cerebellar regions, resulting in numerous physical and mental issues, among them right-side paresthesia, loss of balance and walking difficulties, left-side weakness, irregular tics and shakes, depression, anxiety, memory loss, and sleep disturbances.

28. The strokes left him with substantial impairments to such major life activities as coordination of motor functions and the performance of manual tasks. The memory deficiencies did not impair Dr. Boyd's cognitive or intellectual functioning.

29. Beginning early September, 2014, Dr. Boyd underwent intense therapy and treatment.

30. Dr. Boyd was on FMLA leave at the time.

31. He made a remarkable recovery to the point that his treating physician, Perry C. Rothrock III, M.D., approved Boyd's return to work with few limitations after only six (6) weeks since the debilitating strokes.

32. On October 20, 2014, Dr. Rothrock sent an email to Triniscia Griggs, St. Jude's

Benefits Analyst, with copies to Dr. Kip Guy (Chair of St. Jude's Chemical Biology and Therapeutics ("CBT") Department); Julianne Bryan (Director of Operations of CBT); and Iris Thompson (Admin. Director of CBT) releasing Boyd to return to work, effective October 20, 2014, with the restriction that Dr. Boyd take it slow initially upon returning to work until a normal workday of eight (8) hours was achieved.

33. Dr. Boyd returned to work on or about October 20, 2014.

34. Approximately two (2) weeks later, Boyd verbally informed Dr. Guy that Dr. Rothrock advised him to refrain from all lab bench work because of some of the continuing physical effects of the strokes; specifically, the irregular shakes and tics. Dr. Guy agreed to this accommodation as Boyd's treating physician advised.

35. Dr. Guy reaffirmed his agreement to this accommodation in a meeting with Boyd on or about March 3, 2015.

36. Approximately 1-2 months after returning to work, Dr. Boyd was back up to an eight (8) hour day at St. Jude. He was fully functional and productive without handling chemical substances, which was never more than a marginal aspect of his job.

37. Over the course of the next 14 months, Boyd continued to be fully functional and productive. He engaged in new collaborations and continued to exceed his employer's expectations. He was happy to be back at work.

38. Boyd's drive, work ethic, initiative, and commitment to the St. Jude kids never flagged. (*See* Exhibit 3 – Annual Activities).  He remained the consummate team player.  For example, in December, 2015, he offered to assume an additional job duty as assistant to Project Management Operations ("PMO") because it was understaffed at the time and having difficulties in supplying project resources.

39.  During this time, Dr. Boyd provided Dr. Guy and his officemates, Dr. Jaeki Min, Ph.D. and Ms. Cynthia Jeffries, M.S., with periodic updates on the status of his health and information about the medications he was taking. He did so as a precaution in case something ever happened to him at work that required medical attention.

40.  Plaintiff fell asleep during a meeting sometime in December, 2015. He apologized immediately afterwards.  At the time of this incident, Dr. Rothrock was aware of stroke-related sleep disturbances that were causing Boyd's fatigue.  A treatment plan was not yet in place, however, because the underlying medical condition had not yet been identified.

41. On January 6, 2016, Plaintiff notified Dr. Guy that Dr. Rothrock identified the sleep disruptions and consequent fatigue that Plaintiff had been experiencing of late as a REM sleep disorder. The following day, Boyd began taking Clonazepam as prescribed by Dr. Rothrock. The outcome was positive and within a few weeks Dr. Boyd was working full eight hour days without succumbing to noticeable fatigue.

42. At the request of Defendant's Occupational Health Services, but without prior notice of the reason for the request, Dr. Boyd met with LaQuinta Whitmore-Sisco, MSN, RN, COHN (Manager of Occupational Health Services) and Danielle Alvaredo (Occupational Health Nurse) on January 12, 2016.  Boyd was asked about his medications and given an Interactive Process Questionnaire for completion by his treating physician.

43. Ms. Whitmore-Sisco and Ms. Alvaredo told Dr. Boyd that their meeting with him was "a typical ADA Meeting;" that such meetings were ordinarily conducted every 12 weeks; and that the process would include review by a committee that would propose options if an accommodation was required.

44. The meeting of January 12, 2016, was baffling to Dr. Boyd.  It was his first (and only)

7

"ADA Meeting," even though he had been working continually and exceeding expectations for approximately 14 months after returning to work on October 20, 2014, following his strokes.

45. This positive outcome is attributable to the reasonable accommodation that had been recommended by Boyd's treating physician and approved by Dr. Kip Guy approximately 14 months earlier.

46. Dr. Boyd was never told at any time during those 14 months that the accommodation was ineffective; that his productivity was deficient; that the accommodation was creating an undue burden or hardship for St. Jude; that it was too costly; or that alternatives would have to be considered.

47. The informal means by which Dr. Boyd requested that he be relieved of laboratory bench work and the informal means by which the requested accommodation was approved by Dr. Guy are wholly consistent with the ADA.

48. On January 19, 2016, Dr. Rothrock emailed the completed Interactive Process Questionnaire to Occupational Health Services. His response to the Questionnaire included an unequivocal statement to the effect that he did not think that placing Boyd on medical leave was necessary.

49. Dr. Rothrock supplemented his responses to the Questionnaire with a more detailed letter in which he stated that Dr. Boyd's sleep disorder was now being managed and under control. He opined that Dr. Boyd "will be able to maintain an average of 8-hour work days." With respect to a reasonable accommodation, Dr. Rothrock added the following:

> The most significant accommodation in his work will involve restriction in handling dangerous substances in the lab secondary to several stroke related issues. He has some balance issues affecting his left leg in addition to impairment of grip of his left hand. He also has a motor tic disorder related to the portion of the stroke that affected his cerebellum that controls coordination of all major function which causes unpredictable occasional jerks of the arm. The

8

>accommodation that will be required until improvement is observed is that he avoid any activity in the lab in which his movement disorder might endanger himself or others by causing unintentional exposure to whatever dangerous substances are being used in the lab.  <u>There should be no problem with him being in the lab and instructing others on proper procedure.</u>  (*emphasis added*).

50. As noted, the accommodation formally recommended in writing by Dr. Boyd's treating physician was identical to the accommodation that had been in place since Plaintiff's return to work after his strokes.  His able research assistants performed the laboratory bench work under his supervision.  They never complained that they were unduly burdened as a result.  As also noted, Boyd's performance continued to exceed St. Jude's expectations and he continued to perform all of the duties for which he was hired.

51. Defendant's ADA Committee met on February 4, 2016.  Boyd did not know that the Committee was meeting.  He was not invited to the meeting.  No member of the Committee ever met with him or spoke with him before or after the meeting.  His input was never sought and he never had an opportunity to provide any input. He was never involved in any discussion or dialogue with the Committee about his work or his medical condition.

52. The Committee did not confer with Dr. Rothrock.  Beyond asking him to complete a standard form, the Committee did not seek Dr. Rothrock's input at any time.

53.  On February 10, 2016, Boyd was summoned to meet with Kathleen Speck, Director of Labor and Employee Relations, and Dr. Kip Guy.

54. Dr. Boyd was presented with the findings of the ADA Committee. He was informed of the denial of the accommodation that Dr. Rothrock had requested on his behalf.  Instead, the Committee recommended medical leave.

55. At the meeting of February 10, 2016, Ms. Speck informed Boyd that Dr.

9

Rothrock's recommended accommodation was rejected because Defendant did not think it was reasonable. What made it unreasonable -- according to Defendant's representatives at the meeting -- was Plaintiff's inability to handle chemical substances.

56. Defendant's representatives incorrectly assumed that handling chemical substances or lab bench work was an essential function of Dr. Boyd's job.

57. At the meeting of February 10, 2016, Defendant's representatives turned the ADA Committee's recommendation of medical leave into a directive. Even though Dr. Rothrock did not think that medical leave was necessary and even though Dr. Boyd had not requested it, Plaintiff was placed on medical leave for a full 12-week period under the FMLA, effective immediately.

58. St. Jude's representatives turned a deaf ear to Boyd's objections to the accommodation imposed by dictate as unreasonable.  Similarly, they were unwilling to consider other alternatives.

59. According to the Committee, the leave would provide Dr. Boyd with an opportunity "to heal."  Sadly, it was to have the opposite effect.

60. On or about February 11, 2016, St. Jude sent an email to Dr. Boyd, which stated as follows in pertinent part:

> The supporting documentation for your leave of absence request has been received and reviewed.  Your request for leave will begin  02/11/2016 and the anticipated return to work date is listed as 05/05/2016. The requested leave will be counted against your annual FMLA leave entitlement.
>
> *****
>
> You must use accrued paid sick, vacation leave, and personal time for unpaid leave under the FMLA.
>
> *****

> You have the right to be restored to the job you left or an equivalent job with the same pay, benefits, terms and conditions of employment if you return to work at St. Jude Children's Research Hospital when your leave expires under the FMLA.
>
> ****
>
> We require that you give us at least three work days notice of your intent to return to work.

61. At no time during the period beginning in early January, 2016 through February 11, 2016, did St. Jude engage in the interactive process with Dr. Boyd in a meaningful way as contemplated by the ADAAA. Had it done so, it would have learned that handling chemicals was not an essential function of Boyd's job; that the restrictions set forth in Dr. Rothrock's letter certainly did not preclude Dr. Boyd's presence in the lab for management, consultative and supervisory purposes; that the accommodation formally requested in writing by Dr. Rothrock on January 19, 2016, had been in effect for approximately 14 months at little or no cost to St. Jude; and that Dr. Boyd had consequently remained an active, valued and productive employee, who was consistently performing the essential functions of his job.

62. Boyd expressed his frustration at not being able to meet with and communicate directly with the ADA Committee on several occasions.

63. Had St. Jude reached out to Dr. Rothrock for his opinion on the likely effect of a 12-week medical leave on Boyd's health, it would have learned that it would take unusual occurrences for Boyd to regain complete function of his existing brain deficiencies; that medical leave for 12 weeks was not necessary because Boyd's sleep disorder was under control, and that the very core of his being was inextricably linked to his work as a scientist for St. Jude. To deny him the opportunity to continue serving would have devastating psychological consequences.

11

64. Boyd was anxious to return to work as soon as possible.

65. With that in mind, he made another attempt to engage St. Jude in the interactive process a week later with an email to Kathleen Speck and Kip Guy dated February 18, 2016. In addition to informing Ms. Speck and Dr. Guy about improvements to his health and sharing with them what working at St. Jude meant to him, Dr. Boyd proposed eight (8) different projects that he was capable of undertaking immediately and that addressed specifically identified needs of the Department. He referred to the project alternatives as alternative accommodations. (Boyd's email of February 18, 2016, is attached hereto as Exhibit 4 and is incorporated in full herein by reference.)

66. Boyd waited for a response to his proposals for over a week. By February 29, 2016, he had not received one and proceeded to file a charge of disability discrimination with the EEOC based on St. Jude's refusal to provide him with a reasonable accommodation.

67. He was still waiting on April 4, 2016, when he sent another email to Ms. Speck with copy to Dr. Guy, stating, *inter alia,* "I am ready, willing and able to return to full-time work, and continue to believe this period of forced leave is unreasonable and a violation of my rights under the ADA." He repeated several of the project proposals enumerated in his email of February 18. He signaled his alarm about being kept in the dark with the following statement: "I have noticed my group has been removed from my supervision and that I was removed from the Emergency Roll Call list published recently. This action is not typical, for example, when expectant mothers leave on maternal leave for 6 weeks. I also don't recall this happening during the period I was off during my stroke. I find this troubling and a sign of suspicious activity."

68. Although Ms. Speck had acknowledged receipt of the email of February 18, 2016 on

February18, Dr. Boyd did not receive a definitive response to his proposals of February 18 until April 22, 2016.

69. The long wait heightened Dr. Boyd's anxiety and deepened his depression. Defendant's response of April 22, 2016 exacerbated these conditions, giving rise to despair on Boyd's part, particularly because numerous statements in the letter confirmed his suspicions that his employer did not intend to comply with the FMLA, the ADAAA and its own policies

70. Although St. Jude's FMLA policy states that the employee <u>must</u> request FMLA, Boyd was placed on FMLA involuntarily, against his objections, and for reasons that were not supported with any certification by his healthcare provider.

71. Consistent with the FMLA, St. Jude's policy provides: "You have a right to be restored to the job you left or an equivalent job with the same pay, benefits, terms and conditions of employment if you return to work at St. Jude Children's Research Hospital when your leave expires under the FMLA."  The notice Boyd received from St. Jude on February 11, 2016, regarding his rights under the FMLA also stated that the expected date of his return was May 5, 2016, subject only to a release from his healthcare provider attesting to his fitness for duty.

72. Notwithstanding St. Jude's legal obligations and commitments, its letter to Boyd of April 22, 2016 conditioned Dr. Boyd's return from FMLA leave on his agreement to several demeaning provisions that effectively altered the terms and conditions of his employment and, taken together, added up to a demotion.

73. For example, from the start of his employment in 2007 until he was placed on FMLA leave on February 11, 2016, Boyd worked flexible hours, usually arriving before 6:00 a.m. and leaving sometime between 3:00 p.m. to 4:00 p.m.  Neither his superiors nor his co-workers ever objected to these hours.  After the stroke, maintaining these hours became particularly important

to him for safety reasons as they enabled him to avoid the heightened anxiety and panic attacks he experienced when driving on the expressway in heavy traffic during rush hours. St. Jude now demanded that Boyd change his work hours from 8:30 a.m.to 5:00 p.m.

74. From the start of his employment in 2007 until he was placed on FMLA leave, Dr. Boyd shared an office with one other Principal Laboratory Medicinal Chemist and a Principal Laboratory Analytical Chemist in the Department of Chemical Biology and Therapeutics. The rationale for their sharing an office was to facilitate communication between chemistry centers and the resolution of common issues. St. Jude now insisted, unreasonably, that Dr. Boyd move away from his group and share an office with two other employees (a student and a senior scientist) who were not even in his field. Isolation from his former group would not only diminish his role and create an impediment to collaboration, Defendant's insistence on these conditions constituted violations of both the ADAAA and FMLA.

75. The alteration of the terms and conditions of his employment also included a diminution of his former supervisory responsibilities.

76. As an "accommodation" to Boyd's disability, St Jude incorporated many of the projects that Boyd had proposed in his letter of February 18, 2016, in the list of job duties attached to its letter of April 22, 2016. St. Jude's response time of more than two (2) months is unreasonable and constitutes a violation of the ADAAA.

77. If St. Jude's letter of April 22, 2016, purports to constitute a continuation of the 'interactive process,' the process was not continued in good faith. Defendant shifted its position, contending for the first time that FMLA leave and Boyd's removal were necessary because he presented a direct threat of physical harm to his colleagues or himself.

78. Defendant's erroneous belief was not based on any medical evidence or an individualized

assessment. Rather, it was based on unsubstantiated rumors and statements purportedly made by Boyd that were decontextualized beyond recognition.

79. Defendant changed its course, cast Plaintiff in a negative light and imposed humiliating conditions as prerequisites to allowing him to return to work only after he filed his EEOC charge of discrimination with the EEOC.

80. St. Jude's placement of Dr. Boyd on involuntary FMLA was not a reasonable accommodation because it was ineffective. He did not heal and his health deteriorated.

81. The deleterious effects on Boyd of Defendant's violations of the FMLA, refusal to provide him with a reasonable accommodation, and failures to engage meaningfully in the interactive process aggravated his anxiety and depression and increased the frequency of irregular appendage jerks. He experienced panic attacks more often and instances of stroke-related neck pain reoccurred to a terrifying degree.

82. He was left a broken man, incapable of continuing his career and working in his chosen profession.

83. In July, 2016, Dr. Boyd applied for long-term disability insurance. Upon The Hartford Insurance Company's approval, Defendant terminated Dr. Boyd's employment on or about September 12, 2016.

84. As a direct and proximate result of the actions of Defendant complained of herein, Plaintiff has suffered and will continue to suffer the loss of employment benefits, including health insurance, for many years to come.

85. As a direct and proximate result of the actions of Defendant complained of herein, Plaintiff has incurred substantial expenses to mitigate his damages.

86. As a direct and proximate result of the actions of Defendant complained of herein,

Plaintiff has suffered great anxiety, depression, humiliation, emotional distress and the loss of life's enjoyments.

87. The actions of Defendant complained of herein were intentional or taken with reckless disregard of Plaintiff's rights.

## CAUSES OF ACTION

### Count One – Violation of FMLA, 29 U.S.C. § 2614

88. Plaintiff incorporates paragraphs 1 through 87 above as though specifically set forth herein and for causes of action against Defendant states the following:

89. Defendant's failure or refusal to restore Plaintiff to his former position or an equivalent position under the same or equivalent terms and conditions of employment constitutes a violation of rights secured to him by the Family and Medical Leave Act, 29 U.S.C. § 2614.

### Count Two – Violation of ADAAA, 42 U.S.C. § 12112(a)(5)(A)

90. Defendant's failure to make a reasonable accommodation to Plaintiff's known physical limitation constitutes unlawful employment discrimination under the ADAAA, 42 U.S.C. § 12112(a)(5)(A).

### Count Three – Violation of ADAAA, 42 U.S.C. § 12203(a)

91. Defendant's threats and imposition of harsh and demeaning conditions as prerequisites for his return to work after he filed a charge with the EEOC for disability discrimination constitute unlawful retaliation under the ADAAA, 42 U.S.C. § 12203(a).

## PRAYER FOR RELIEF

Although St. Jude's laudable contributions to children and families throughout the world are indisputable, it must still be held accountable for its unlawful conduct and the grievous injuries suffered by Plaintiff. He brings this action with a heavy heart.

**WHEREFORE, PREMISES CONSIDERED, PLAINTIFF PRAYS** that, upon bench trial, the Court grant the following relief:

1. A permanent injunction enjoining Defendant, its officers, executives, successors, assigns and all persons in active concert or in participation with Defendant from engaging in unlawful employment and labor practices, as alleged above, which deprive Plaintiff and other eligible employees of rights secured to them by the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* and the Americans with Disabilities Act Amendments Act, 42 U.S.C. §§ 12101, *et seq.*

2. Lost benefits and other pecuniary losses proximately caused by Defendant's unlawful conduct in an amount to be proved at trial.

3. Compensatory damages under the ADAAA for humiliation, anxiety, depression, mental anguish, and loss of life's enjoyment caused by Defendant's unlawful discrimination and retaliation against Plaintiff in an amount to be proved at trial.

4. Liquidated damages under the FMLA for Defendant's actions against Plaintiff taken willfully or in bad faith.

5. Prejudgment interest and all costs, disbursements, litigation expenses, expert witness fees and reasonable attorney's fees as provided by law.

6. Such further relief to which Plaintiff is justly entitled under law and equity.

    Respectfully submitted,

    s/Reva M. Kriegel, Tenn. Bar No. 14930
    254 Court Avenue, STE 104
    Memphis, Tennessee 38103
    Telephone: (901) 527-1319
    Fax: (901) 529-9101
    Email: kriegelreva@hotmail.com